Harold A. GOODMAN, Woodrow Debrew, and Joyce K. Martin, Appellants,

v.

James R. SCHLESINGER, Secretary of Defense, John Warner, Secretary of the Navy, and Rear Admiral E. T. Westfall, Commanding Officer, Norfolk Naval Shipyard, Appellees.

No. 76–2117.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 7, 1977.

Decided Oct. 2, 1978.

Butzner, Circuit Judge, concurred in part and dissented in part with an opinion.

Randall G. Johnson, Richmond, Va. (Henry L. Marsh, III, Hill, Tucker & Marsh, Richmond, Va., on brief), for appellants.

Peter B. Loewenberg, Atty., Dept. of the Navy, Washington, D. C. (James Oast, Asst. U. S. Atty., Norfolk, Va., on brief), for appellees.

Before BUTZNER, RUSSELL and WIDENER, Circuit Judges.

WIDENER, Circuit Judge:

Harold A. Goodman, Woodrow Debrew, and Joyce K. Martin brought this Title VII employment discrimination action[1] against the Secretary of Defense, the Secretary of the Navy, and the Commanding Officer of the Norfolk Naval Shipyard, Portsmouth, Virginia. The named plaintiffs brought suit in their own behalf and for a class alleged to consist of "all black persons and all females who have sought employment and who are employed or might in the future be employed by the Norfolk Naval Shipyard . . . who have been denied, or in the future will be denied equal employment opportunities by defendants on the grounds of their race, color and/or sex." Plaintiffs alleged in the complaint thirteen different types of employment discrimination,[2] thus in their view mounting an across

---

1. 42 U.S.C. § 2000e–16(c).

2. Plaintiffs have alleged that the Shipyard practices unlawful employment discrimination in the following areas:

 (a) recruitment standards;

 (b) hiring practices;

 (c) denials of promotions;

 (d) denials of assignments of supervisory duties;

 (e) the utilization of a system of promotions which relies on the unchecked, unvalidated subjective recommendations of supervisory personnel;

 (f) the unequal treatment by supervisory personnel of minorities compared with other employees, including, but not limited to, the imposition of:

 (1) harsher and more stringent performance standards for minority employees;

 (2) more severe disciplinary penalties on such employees;

 (g) the denial of seniority time credit in permanent assignments while participating in training programs;

the board attack on Shipyard employment policies.

All three named plaintiffs are black. In support of his individual claim, Goodman asserted that he "has been a victim of some or all of the discriminatory acts" set out above. The facts alleged by him, however, charge only one of the thirteen varieties of discrimination, the unlawful denial of a promotion. Debrew's allegations do not include the broad statement included in Goodman's complaint quoted above, but, in fact, his claim reaches three of the alleged practices: discrimination by his immediate supervisor in work assignments, in work appraisals, and the unlawful denial of a promotion.[3] Mrs. Martin alleges only that she was denied promotion on account of her sex; her statement of the claim, like Debrew's, contains no broad assertion of general wrong. The three named plaintiffs thus present claims of unlawful discrimination in promotion, work assignment, and supervisory evaluations, three of the alleged categories.

Prior to trial, the district court, on the Shipyard's motion, denied class certification on the ground that the plaintiffs had failed to establish any of the four requirements of FRCP 23(a). The case on the merits was tried to the district court sitting without a jury, which found against the three named plaintiffs, and dismissed the action. Plaintiffs appeal from both the adverse judgment and the denial of class certification. For the reasons stated below, we affirm the judgment of the district court dismissing the individual claims, vacate the denial of class certification, and remand for further proceedings.

We first consider the claims of the named plaintiffs, Harold A. Goodman, Woodrow K. Debrew, and Joyce K. Martin.

Goodman was hired by the Shipyard in 1957 as an apprentice boilermaker. In 1966, he was promoted to associate supervisor inspector, a position comparable to the foreman level, and, in 1971, was appointed a foreman boilermaker. The availability of a merit promotion to the position of boilermaker general foreman, which is the subject of Goodman's claim, was announced on January 4, 1974. On March 12, 1974, the Shipyard Industrial Relations office published a list of six persons who were certified as highly qualified for the promotion to boilermaker general foreman. "Highly qualified" means "among the better qualified applicants for promotion." Among those on the list were Goodman and John L. Thompson, a white male.

Harold A. Staneski, the Shipyard selecting official, appointed Ervin T. Cartwright, the shop superintendent for the available position, to review the applications and other material pertinent to the six candidates. Cartwright recommended Thompson for the promotion, Staneski concurred, but "certain irregularities in the selection process" plaintiffs agree are "not involved in the suit" voided Thompson's promotion. Subsequent to this initial, abortive, appointment, four of the six persons on the highly qualified list requested that their names be withdrawn, and they were removed from the list, leaving only Goodman and Thompson.

This time, Staneski appointed a recommending panel of three members, Cartwright and two others: Jack H. Lewelyn, who was the superintendent from a shop other than the one in which the promotion was available, and James R. Talley, a general foreman, who also was from another

(h) the refusal to promote and assign appropriate duties to those who successfully complete training programs;
(i) the assignment and transfer of minority employees into work groups and job categories with low advancement potential;
(j) the refusal to develop and implement effective affirmative action programs of equal employment opportunity;
(k) the discouragement of filing of discrimination complaints;

(*l*) the failure to discipline or reprimand supervisory or management personnel for taking discriminatory actions;
(m) the failure to terminate the effects of past and present discrimination.

3. Debrew's statement of the claim, unlike those of Goodman or Mrs. Martin, fails to allege that he was unlawfully denied a promotion. Nevertheless, the parties have litigated the issue, and, accordingly, we consider it here. FRCP 15(b).

shop, and who, in accordance with regulations, was black. Cartwright developed criteria to be used by the panel in considering the candidates, and the panel members agreed to use these criteria. The panel rated the candidates, and unanimously recommended Thompson for the promotion. Staneski concurred in the recommendation and promoted Thompson.

Subsequent to Thompson's second promotion to the position, however, the Secretary of the Navy determined that due to violations of various regulations the promotion was improper, and by letter dated May 13, 1975 directed the Shipyard Commander to cancel the promotion and give priority consideration to Goodman for the resulting vacancy. On June 12, 1975, however, the Shipyard Commander requested the Secretary to reconsider his order, and stated that he would not implement the Secretary's earlier direction until further instruction was received. By letter dated July 25, 1975 the Secretary ordered that the Shipyard without delay implement the directives of the letter of May 13th, and on September 28, 1975 Goodman was promoted to the position of general foreman.

As related above, Thompson's initial selection was set aside for procedural irregularities which are admitted to have nothing to do with this case. Goodman had complained about Thompson's initial promotion. After Thompson's second promotion, this time on the recommendation of the panel, Goodman again complained. The Secretary of the Navy set aside Thompson's second promotion, again for reasons unrelated to racial discrimination. It seems that Thompson's name would not have been placed on the "highly qualified" list unless he had previous supervisory experience for the period of time that his record showed that he had, and which he in fact had. But another regulation provided that only 120 days in a calendar year could be spent in a temporary promotion, and Thompson had served in excess of that permitted by the regulation. In addition, Thompson had received a work appraisal for his duty on temporary promotion, and yet another regulation provided that a work appraisal

properly could be given only for performance in a non-temporary position. Thompson had also received credit for his service in the permanent position while awaiting administrative determination of the correctness of the promotion. Thus, for these reasons, the Secretary of the Navy determined that Thompson's name should not have been on the highly qualified list, leaving only Goodman's, and there being no other applicant, the Secretary directed the Shipyard Commander to promote Goodman without delay.

Thompson's first promotion was set aside by the Shipyard Commander for reasons unrelated to race, and his second promotion was set aside by the Secretary of the Navy for reasons unrelated to race. Although Goodman complained about racial discrimination on both occasions, the Shipyard Commander specifically found there was no racial discrimination in connection with Goodman's failure to receive the position, and, following an examiner's report that there was no racial discrimination relating to the second promotion, the Secretary of the Navy found that he was unable to find racial discrimination in connection with Goodman's failure to get the promotion. The Secretary, nevertheless, offered Goodman the opportunity to participate in an administrative investigation on the basis of race, but apparently Goodman chose to file this suit instead. Goodman's theory is that the reason regulations were violated in promoting Thompson was because of Goodman's race.

The district court, however, found that the determining reason for Goodman's failure to win the promotion was the presence of "an abnormal situation" in Goodman's department, described as the nuclear submarine boiler department, and its belief that the record of Goodman's previous demonstration of lack of aggressiveness did not show that he had the desired qualities of being able to reorganize the department. The court further found that the same promotion decision would have resulted even if Goodman were white, and thus concluded that "there was no discrimination in Mr.

Goodman's case." For us to overturn the district court's determinations that race did not affect the promotion proceedings and that the selection of Thompson hinged upon the appraisal that Goodman lacked the requisite aggressiveness, we must be persuaded these findings were clearly erroneous. FRCP 52(a).

Goodman argues that the racial animus involved in denying him the initial promotion is demonstrated by the following evidence: Goodman never had received a temporary promotion to general foreman, while Thompson had, and one of the ways by which the Shipyard traditionally discriminated against black employees was in their exclusion from temporary promotions. In addition, Thompson not only served in his temporary duty for a period in excess of that permitted by Shipyard regulation, but he also received a work appraisal for his temporary duty when by regulation the appraisal properly could be given only for performance in a non-temporary position, and a necessary condition for Thompson's rating of highly qualified was his temporary duty work appraisal. Without Thompson's rating of highly qualified, he would not have been promoted since Goodman validly was rated highly qualified. Further, Goodman argues, illegal discrimination is illustrated by the Shipyard's continued refusal to promote Goodman and demote Thompson after the Secretary of the Navy discovered the administrative errors and directed Goodman's promotion. Finally, he argues that the effects of the special situation upon which the district court in part relied were specious, as demonstrated by Goodman's work record, which includes an efficiency award for work performed on a nuclear submarine, but lacks any derogatory comment on his leadership ability.

The government, however, produced evidence that black employees in recent years had received increasing temporary and permanent promotions, and that affirmative action goals in these areas had been far surpassed. In addition, both Cartwright, Goodman's supervisor and a member of the panel, and Harold Staneski, the promoting official, were unaware that the length of Thompson's temporary promotion had exceeded permissible limits. Moreover, Staneski did not control the designation of Shipyard personnel as "qualified" or "highly qualified". That function was performed by the Shipyard Department of Industrial Relations.

Additional evidence indicated that the Shipyard's submarine repair program had experienced a period of crisis, with cost overruns and delays of up to six months: "We just couldn't get them done." Thompson received his temporary promotion by special request during this period as a man who was determined and aggressive and would come back on his own time to get the job done. Further, the promotion panel unanimously recommended Thompson for the promotion. With regard to the Shipyard's refusal to promote Goodman and demote Thompson after the Secretary of the Navy had discovered the procedural errors that voided Thompson's selection, Admiral Westfall, the Shipyard commanding officer, testified that his actions were founded upon a legitimate concern that his superior's actions, if only slightly extended as precedent, would adversely affect the operation of the Shipyard by providing that everybody to be promoted to supervisory status would have to have temporary duty as did Thompson, or else see this valuable experience necessarily not considered. When the Shipyard's request for reconsideration was denied, Goodman was promoted.

■ Viewing this evidence as a whole, we cannot say with a "definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The district court's findings of facts on this record are not clearly erroneous. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 420, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Apart from its relevancy as to racial discrimination, the violation of regulations demonstrated in this case are not questions before us, and we note they were corrected by administrative action within the Navy. In all events, the record

does not indicate they occurred as a result of Goodman's race.

Plaintiff Debrew's individual claim alleged illegal discrimination by his immediate supervisor in work assignments, in work appraisals, and in promotions. The claims are interrelated. Sometime in 1973 he requested a transfer from his supervisor, John W. Sedberry, and stated he thought he might have a better chance with another supervisor. Sedberry, however, thought that Debrew had been doing a "real good job," and that since the shop was in the middle of a project, he would like to keep Debrew, for jobs suffer by transfers in the middle of a job. Debrew later did transfer to a different shift and supervisor. This is the only evidence relating to Debrew's attempted transfer, and it was derived from Sedberry's testimony, for Debrew himself never testified. In late 1973, Debrew applied for two different promotions; he was selected for neither. His theory is that discriminatorily low work appraisals from Sedberry (caused in part by Sedberry's failure to direct the desired transfer) led to his failure to qualify for either promotion. In further support, Debrew argues that after his transfer he received a higher appraisal.

 The Shipyard, however, produced evidence that Debrew was an average employee, neither outstanding nor unsatisfactory, and Sedberry's ratings of Debrew were average, or normal, to a little higher than average, good, or very good. In addition, testimony indicated that Sedberry in general tended to rate employees lower than did the other supervisor, and that at times he rated a white employee lower than Debrew, and a black employee higher. Finally, the Shipyard's Director of Industrial Relations, Joseph E. Wilkinson, testified that even if Debrew had received high ratings from Sedberry, as well as from the other supervisor, he still would not have had a score high enough to merit promotion, and Debrew did not contest this evidence at trial. Viewing this evidence, the district court found against Debrew. We should add that, as the Shipyard through Wilkinson's testimony established, even with higher ratings from Sedberry, Debrew would have had a lower score than anyone certified to a manager for selection that year. Thus, the district court found that Debrew had not proved a case of discrimination. We are of opinion its findings are not clearly erroneous. FRCP 52(a).

Joyce K. Martin, the third named plaintiff, was hired by the Shipyard as an apprentice machinist in 1969. On May 20, 1974, merit promotions for positions as shop planner were announced, and she, along with fifteen males, were certified as highly qualified for the positions. Seven of the fifteen, but not Mrs. Martin, were selected for promotion. On September 23, 1974, other merit promotions to shop planner were announced, and this time Mrs. Martin and twelve males were certified as highly qualified. Four applicants, again excluding Mrs. Martin, were selected.

Shipyard regulations require that "when a recommending panel is used and one of the candidates under consideration is a minority or woman, the panel will include a rating minority or female member as appropriate." When Leonard M. Peddy, selecting official for the May promotion appointed the recommending panel, he appointed no woman. Peddy testified that his understanding of the regulation at the time was that if one of the applicants belonged to a minority, he was required to appoint a minority member to the panel, and, as a result, he had appointed a black member, but not a woman. He further testified that the panel's recommendations were unanimous, and that no one who was recommended by the panel had as little experience as Mrs. Martin, who made no administrative complaint about her failure to receive the appointment.

Howard Formey was the selecting official for the September promotion. The first panel he selected had no female, and Formey testified that he assigned no female to the panel because he did not know a female was on the list of highly qualified applicants. On learning of Mrs. Martin's presence as an applicant, and without acting upon or considering the first panel's recom-

mendations, he reconstituted the panel by appointing a woman member. This new panel made four unanimous recommendations, but did not include Mrs. Martin as she was not among the four highest scoring candidates. Subsequently, Mrs. Martin received a temporary promotion, and later joined in filing this litigation.

■ In evaluating this evidence, the district court found that the promotions were conducted in an impartial manner. Mrs. Martin, the court further found, did not have the experience of those who were selected for the promotions, and any departures from Shipyard procedures were not done with discriminatory purpose. The district court found that she had not proved that anyone with less or equal qualifications had received the appointments ahead of her and denied her claim. We are of opinion the findings of the district court are supported by the record and are not clearly erroneous. FRCP 52(a).

■ In the trial of the case, as well as in its opinion, the district court properly recognized that evidence of discrimination against classes of which the plaintiffs were members was admissible as relevant evidence in the claims of discrimination against the individual plaintiffs. See *Lamphere v. Brown University*, 553 F.2d 714, 719 (1st Cir. 1977); *Calage v. University of Tennessee*, 554 F.2d 297 (6th Cir. 1976); *Paddison v. Fidelity Bank*, 60 F.R.D. 695, 697 (E.D.Pa.1972). It also considered evidence of patterns or practices of discrimination, past and present, which might involve a class of which the plaintiffs were members. Having taken such matters into account, it nevertheless found for the defendants. We affirm the judgments in favor of the defendants. The only evidence which plaintiffs can suggest was not admitted or about which discovery not permitted which might have had relevancy in a class action was evidence of the result of tests administered by the Shipyard which plaintiffs claim may have discriminated against black and women employees. But plaintiffs candidly admitted that such tests would not affect the three named plaintiffs. The dis-

trict court having considered the evidence applicable to plaintiffs if the action had been tried as a class action, and nevertheless having found for the defendants, we are of opinion its judgment in this respect should simply be affirmed, and that should there be any revival of the class action following remand, the plaintiffs may not participate. They have had their day in court. *Huff v. N. D. Cass Company of Alabama*, 485 F.2d 710 (5th Cir. 1973) (en banc); *Moss v. Lane Company, Inc.*, 471 F.2d 853 (4th Cir. 1973); *Cox v. Babcock & Wilcox*, 471 F.2d 13 (4th Cir. 1972).

We now consider the assertion that the district court erred in refusing to certify the litigation as a class action. Cases such as *Windham v. American Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977), cert. den., 968 U.S. 435, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978); *Roman v. ESB, Inc.*, 550 F.2d 1343 (4th Cir. 1976) (en banc); and *Doctor v. Seaboard Coast Line R. Co.*, 540 F.2d 699 (4th Cir. 1976), have detailed many of the considerations that enter into the decision of whether to grant class certification, and need not extensively be reviewed here.

Although suits involving racial discrimination lend themselves generally to class treatment, the Title VII plaintiff nonetheless must satisfy the requirements of Rule 23, FRCP, and the burden of proving this rests upon the plaintiff. *Doctor*, supra, 540 F.2d at 706–707; see *East Texas Motor Freight Systems, Inc. v. Rodriguez*, 431 U.S. 395, 405–06, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). In deciding whether the plaintiff has met this burden, however, the trial court usually should consider more information than the bare allegations of the complaint. *Roman* at 1349; *Doctor* at 707. For example, the district court may permit discovery into whether the plaintiff is "asserting a claim which, *assuming its merit*, will satisfy the requirements of Rule 23." *Doctor* at 707 (emphasis in original); *Windham* at 64 and n. 5. As an alternative, the district court may conditionally order the trial to proceed as a class action, FRCP 23(c)(1), and, following trial on the merits, redefine the class or dismiss the class action entirely. *Roman v. ESB, Inc.*, supra.

In this case, the government moved to dismiss the class action before discovery had occurred,[4] and it appears from the record that at the time the trial court dismissed the class allegations, the information upon which the court must have relied was the court file compiled to that point, which did not contain admissions, affidavits, answers to interrogatories, or other papers containing sufficient factual information from which the district court could have ascertained non-compliance with FRCP 23 as a matter of law. The record presents no circumstance to justify a departure from the normal practice that requires the district court to consider more than merely the allegations contained in the complaint in cases in which the complaint on its face does not justify dismissal of the class aspect. While we keep in mind the rule that the plaintiffs have the burden of establishing that the discretion exercised by the district court was clearly wrong, *Windham*, p. 65, we nevertheless think the class claims of Goodman, Debrew, and Mrs. Martin do not on their face fail to meet the requirements of Rule 23(a);[5] and assuming *arguendo* the validity of actual matters contained in the class allegations, we cannot say certification was inappropriate as a matter of law. We thus hold that the district court acted prematurely in denying class certification, and vacate the dismissal of the class action. In setting aside the dismissal of the class action, we imply no opinion as to whether the litigation ultimately should proceed as a class action; we hold only that the district court acted prematurely.

Having decided that the plaintiffs may not recover, but that the trial court acted prematurely in declining to certify the case as a class action, we now face the question of the proper action to be taken on remand.

We have before us the problem described by Judge Gee in his dissent in the panel opinion in *Satterwhite v. City of Greenville, Texas*, 557 F.2d 414, 425 (5th Cir. 1977) (reargued en banc January 9, 1978), as "a headless lawsuit with, in effect, no plaintiff," and as "a potential lawsuit searching for a sponsor." The judgment of the en banc court on rehearing, if not its entire opinion, took the position taken by Judge Gee. 578 F.2d 987 (5th Cir. 1978).

The named plaintiffs may not represent the class on remand. We have decided that point specifically in *Cox* at p. 15. See also the language of the Supreme Court in *East Texas Motor Freight Systems, Inc. v. Rodriguez*, 431 U.S. 395, especially p. 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977).

In *Cox* a similar situation presented itself. There, we affirmed the denial of the plaintiff's claim but had reversed the action of the district court in dismissing the class action because it held the named plaintiff, having lost his claim, "was not a proper representative to maintain a class action." In *Cox* we remanded the case to the district court with instructions that the class action be retained on the docket for a reasonable time to permit the presentation of any proper claims for further relief under such class action and instructed that should no proper claims for further relief be presented within a reasonable time, the district court should strike the class action from the calendar and enter a final dismissal thereof. We see no difference of consequence in the two cases, and accordingly remand the class action to the district court with instructions that it be retained on the docket for a reasonable time to permit a proper plaintiff or plaintiffs, with grievances similar to those of Goodman, Debrew, or Mrs. Martin, in person, to present himself to prosecute

---

4. Plaintiffs filed their first interrogatories to the defendants on July 11, 1975, but the government, after initially opposing making any response to them, provided no answers until March 2, 1976. The district court dismissed the class complaint on October 31, 1975.

5. See *Doctor v. Seaboard Coast Line R. Co.*, 540 F.2d 699, 707 n. 24 (4th Cir. 1976), quoting

*Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974): "Maintainability [as a class action] may be determined on the basis of the pleadings, if sufficient facts are set forth, but ordinarily the determination should be predicated on more information than the pleadings will provide."

the action as a class representative. If such a plaintiff so comes forward, the court should then, on the whole record before it, including the record of the trial, decide whether a class action is maintainable and whether the then named plaintiff should represent the class. *East Texas Freight*, n. 12. If no representative plaintiff so comes forward within a reasonable time, then the district court should strike the class action from the calendar and enter a final dismissal thereof.

Our decision in this case is not inconsistent with the majority in the *Satterwhite* panel opinion, 557 F.2d 414, which permitted the district court to reconsider whether the case should be allowed to proceed as a class action. But it is not consistent with the majority of the *Satterwhite* panel as that case allowed the district court to reconsider whether the original named plaintiff should be allowed to proceed with the class action. Our decision to require the district court to reconsider whether the case should be allowed to proceed as a class action may seem to be at variance with two cases from the Ninth Circuit which contain a review of the authorities, *Vun Cannon v. Breed*, 565 F.2d 1096 (9th Cir. 1977), and *Kuahulu v. Employees Insurance of Wausau*, 557 F.2d 1334 (9th Cir. 1977), which take the position that when the claims of a representative plaintiff become moot there is no case or controversy, similar to the position taken by Judge Gee in his dissent in *Satterwhite*, which we have referred to above. Our holding is apparently contrary to the *Satterwhite* majority in the en banc decision, which also contains an extensive review of the authorities. In these instances, as our opinion may be said to differ with our sister circuits, we prefer a middle ground and respectfully adhere to our precedent in *Cox*, as above mentioned, in which both of these points now before us were decided. The Ninth Circuit cases relied in part on a case from this circuit, *Inmates v. Owens*, 561 F.2d 560 (4th Cir. 1977), in which several prisoners' suits under § 1983 were held moot, the prisoners having been released during the pendency of the suit. *Owens* was neither filed nor certified as a class

action, and we think it is not binding precedent for that reason. It is true that some of the language in *East Texas Freight* may seem to indicate that we should simply affirm the dismissal of the class action as the *Satterwhite* en banc decision held. For example: "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." 431 U.S. p. 403, 97 S.Ct. at p. 1896. Also, the Court's reason the court of appeals erred in certifying the class was that "it was evident by the time the case reached that court that the named plaintiffs were not proper class representatives." p. 403, 97 S.Ct. p. 1896. Nevertheless, the Court's citation in its note 12 of *Cox*, with apparent approval, gives us pause, and thus we adhere to our precedent.

Because no representative plaintiff may come forward on remand, and if one does come forward, there nevertheless may not be prosecuted any class action, we do not consider the effect *East Texas Freight* has had on across the board class actions. Cf. *Shelton v. Pargo*, 582 F.2d 1298, n. 52 (4th Cir. 1978).

AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCTIONS.

BUTZNER, Circuit Judge, concurring in part and dissenting in part:

Except for the denial of relief to Harold L. Goodman, I concur in the judgment of the court.

Goodman's entitlement to back pay and the retroactive adjustments of the other incidents of his promotion to general foreman, such as seniority and pension credits, can be established by adaptation of the principles explained in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). There the Court said:

The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a

racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. . . .

The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection.

*McDonnell Douglas* dealt with hiring, but the Court indicated that its rationale could be applied to "differing factual situations." 411 U.S. at 802 n. 13, 93 S.Ct. at 1824. The Court emphasized this theme in *Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977), when it said:

> The importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act.

Continuing, the Court noted:

> The *McDonnell Douglas* case involved an individual complainant seeking to prove one instance of unlawful discrimination. An employer's isolated decision to reject an applicant who belongs to a racial minority does not show that the rejection was racially based. Although the *McDonnell Douglas* formula does not require direct proof of discrimination, it does demand that the alleged discriminatee demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qual-

ifications or the absence of a vacancy in the job sought. Elimination of these reasons for the refusal to hire is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one. 431 U.S. at 358 n. 44, 97 S.Ct. at 1866.

I therefore conclude that *McDonnell Douglas* can be readily adapted to this case, which involves a promotion instead of initial hiring. *Accord, Haire v. Calloway*, 572 F.2d 632, 634 (8th Cir. 1978); *Blizard v. Fielding*, 572 F.2d 13, 15 (1st Cir. 1978). Tested by its standards, Goodman established a prima facie case of racial discrimination. (i) He is black. (ii) He sought promotion, and his superiors regarded him as "highly qualified." His ultimate promotion by order of the Secretary of the Navy confirms his qualifications. (iii) Despite his qualifications, he was initially rejected. (iv) The position was then filled by a less qualified white employee who was ultimately removed by order of the Secretary of the Navy.

After Goodman proved his prima facie case, the burden fell on the shipyard to articulate a legitimate nondiscriminatory reason for Goodman's rejection.

The yard, however, failed to carry its burden of proof. Its rejection of Goodman was a violation of its own regulations, which it attempted to pass off under the pretext of "administrative error." In this instance, the error consisted of improperly embellishing the work record of Goodman's competitor. The record discloses that the "administrative error" that denied Goodman his promotion was not unique. Such errors were common at the yard, and they were racially discriminatory. The district court found that the yard discriminated on the bases of both race and sex in its hiring and promotion practices prior to the enactment of the Equal Employment Opportunity Act of 1972.[1] Covert discrimination con-

---

1. Long before the enactment of the Equal Employment Opportunity Act of 1972, government officials were barred by the Constitution, a statute, and executive orders from discrimina-

ting on the basis of race or sex. The employees, however, did not have an effective judicial remedy until the 1972 Act. *See Brown v. General Services Administration*, 425 U.S. 820,

tinued after 1972 under the euphemism of "administrative error." An equal employment opportunity coordinator at the yard testified that he was familiar with approximately 300 or 400 complaints filed by employees. When asked how many of these complaints involved administrative or technical violations, he testified:

> I would say about seventy-five percent of the cases that I have had where blacks are involved, it's always an administrative error; but if it's all white, they have no objection to the person being promoted, then they can do it with ease; but if it's a black involved in contention for the job, there's going to be administrative errors; and that's what they, you know, do. A panel would not be properly constituted or they would develop criteria after they found out who was on the certificate. It's always something administratively wrong when blacks are in contention.

Instead of rebutting Goodman's prima facie case, the government premised its defense on the untenable proposition that "Plaintiff Goodman may not prevail unless he shows that discrimination occurred." It was on this legally indefensible premise that the district court predicated its decision.

The fundamental error in this case is the failure to analyze it according to the precepts of *McDonnell Douglas Corp. v. Green,*

411 U.S. at 802, 93 S.Ct. 1817. This error understandably led to the failure to recognize that Goodman proved a prima facie case. Having done so, Goodman did not also have to introduce direct proof of discrimination. Instead, the burden shifted to the government to prove a "legitimate nondiscriminatory reason" for his rejection. 411 U.S. at 802, 93 S.Ct. 1817. *See Teamsters v. United States,* 431 U.S. at 358 n. 44, 97 S.Ct. 1843 (1977). Because the district court misapprehended the law, the "clearly erroneous" criterion of Rule 52(a) is inappropriate. *United States v. Parke, Davis & Co.,* 362 U.S. 29, 43–45, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); 9 Wright & Miller, Federal Practice and Procedure 734 (1971).

I respectfully dissent from the affirmance of the dismissal of Goodman's claim. I would reverse this part of the judgment and remand the case for award of the relief he seeks.[2]

824–26, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *Koger v. Ball,* 497 F.2d 702, 704–05 (4th Cir. 1974).

2. Goodman's qualifications distinguish his situation from those of the other plaintiffs. The evidence discloses that they were less qualified than the appointees.