848 F.2d 476
 46 Fair Empl.Prac.Cas. 1717,
46 Empl. Prac. Dec. P 38,039, 47 Ed. Law Rep. 69
 P.E. BAZEMORE, et al., Plaintiffs-Appellants,
v.
William C. FRIDAY, President of Consolidated University of
North Carolina, et al., Defendants-Appellees (Two Cases).
P.E. BAZEMORE, et al., Plaintiffs,
and
The United States of America, Appellant,
v.
William C. FRIDAY, President of Consolidated University of
North Carolina, et al., Defendants-Appellees (Two Cases).
 Nos. 82-1873, 82-1881, 82-1927 and 82-2065.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 5, 1987.
Decided June 8, 1988.
 
 Edward D. Reibman, Allentown, Pa., David L. Rose, Washington, D.C. (Samuel T. Currin, U.S. Atty., Raleigh, N.C., William Bradford Reynolds, Asst. Atty. Gen., David K. Flynn, Cynthia Drabek, Dept. of Justice, Washington, D.C., Cressie H. Thigpen, Jr., Raleigh, N.C., Julius Levonne Chambers, Eric Schnapper, New York City, on brief), for plaintiffs-appellants.
 Howard E. Manning, Jr., Howard E. Manning, Sr. (Manning, Fulton & Skinner, Raleigh, N.C., on brief), for defendants-appellees.
 Before WIDENER and PHILLIPS, Circuit Judges, and KELLAM, Senior District Judge for the Eastern District of Virginia, sitting by designation.
 WIDENER, Circuit Judge:
 
 
 1
 This employment discrimination case has been remanded to us from the Supreme Court. Bazemore v. Friday, 478 U.S. 385, 400, 106 S.Ct. 3000, 3009, 92 L.Ed.2d 315 (1986). We hold that at least a portion of the district court's fact-finding is clearly erroneous and remand for granting relief in part and for further proceedings in the case.
 
 
 2
 The case's protracted procedural history and relevant facts have been restated by the Supreme Court in its opinion above. Bazemore, 106 S.Ct. at 3004-05. Accordingly, we will not review in detail all of the events leading to our present decision.
 
 
 3
 Suit was initially filed by employees of the North Carolina Agricultural Extension Service (Extension Service) in 1971 alleging race discrimination[1] in employment and in the provision of services on the part of the Extension Service.[2] In 1972, the United States intervened[3] and eventually the complaints were amended to add a claim under Secs. 703 and 706 of Title VII of the Civil Right Act of 1964. See 42 U.S.C. Secs. 2000e-2, 2000e-5. After declining to certify certain classes of plaintiffs and a single class of defendants, the court conducted a trial which lasted for about ten weeks, in which almost every aspect of the Extension Service's employment practices was scrutinized. After trial, the district court decided in favor of the Extension Service in all respects.
 
 
 4
 On appeal to this court, only certain of the district court's many rulings were contested. Initially, we upheld the lower court's denial of class certification. Bazemore v. Friday, 751 F.2d 662, 667-70 (4th Cir.1984), rev'd, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986). We also agreed with the district court that the plaintiffs had failed to show that they had been victims of a pattern or practice or other type of salary discrimination because of their race. Bazemore, 751 F.2d at 670-74. Included was the holding of the panel majority that post-Act discriminatory disparities in salaries that could be traced solely to pre-Act salary discrimination are not actionable under Title VII.[4] Id. at 670. Also fundamental to our ruling was our agreement with the district court that plaintiffs' statistics were unreliable because they failed to take account of a number of other variables that could affect the multiple regression analysis.[5] Id. at 672. Finally, we rejected plaintiffs' assertions that the Extension Service had participated in racial discrimination in the selection of county chairmen, the top administrative position in the Extension Service of the county level. Id. at 674-87. We reasoned that only the recommendations of the Extension Service should be considered rather than any of the final hiring decisions.[6] Id. at 677. For this and other reasons, we affirmed the district court. 751 F.2d at 687. The Supreme Court granted certiorari and reversed our rulings on the issues referred to just above and remanded the case to us.[7] Bazemore v. Friday, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986). Other holdings of the Court in this case will be mentioned in our discussion of the issues presented to us and discussed below.
 
 
 5
 As noted earlier, we will largely dispense with any further restatement of the facts and rely upon the detailed discussion given them in the two prior opinions.[8] We deal with the issues as raised above, whether the district court's findings that the Extension Service did not discriminate in salary and selection decisions were erroneous and whether the lower court erred in not granting class certification as requested by the plaintiffs below.
 
 
 6
 In arriving at our decision on remand, it is most important to quote from the Supreme Court in its opinion, 106 S.Ct. at 3007 n. 8, that,
 
 
 7
 This lawsuit involves two distinct types of salary claims: those of employees subject to the pre-merger discriminatory pay structure and those hired after the merger of the black and white branches. If the accepted pre-1965 disparities continued for employees employed prior to 1965, then respondents violated the law. But, for employees covered by this suit who were never employed under the dual system, it is meaningless to say that the pre-1965 disparity 'continued' past 1972, absent (1) evidence that new disparities were created or begun after the merger that continued past 1972 or (2) evidence that new disparities were created after 1972. (Italics in original)
 
 
 8
 We follow this reasoning in our decision.
 
 
 9
 I. Salary claims of "employees subject to the pre-merger
 
 
 10
 discriminatory pay structure"
 
 
 11
 Initially, in reviewing our decision, the Court noted a fundamental flaw in that portion of the panel majority's opinion relating to the plaintiffs' salary discrimination claims. The Court held that there is a duty on the part of an employer to eliminate any salary disparity between black and white employees that is directly traceable to pre-Act discriminatory policies. 106 S.Ct. at 3006. Thus, since the Extension Service, prior to 1965, admittedly maintained two separate, racially-segregated Extension Service branches for its employees and paid black employees less than their white counterparts, the Extension Service had an obligation to remedy any salary disparities that lingered on. This the Extension Service did not do, and accordingly its inaction constituted discrimination on account of race. For, as the Supreme Court noted, "[e]ach week's pay check that deliver[ed] less to a black than to a similarly situated white is a wrong actionable under Title VII, regardless of the fact that this pattern was begun prior to the effective date of Title VII." 106 S.Ct. at 3006-07. In light of the Extension Service's earlier admission that it had not made all the adjustments necessary to remedy all disparities originating with the pre-Act racially-segregated pay scales, we think it is clear that the district court's finding on this question is erroneous, as was our own, since those decisions were "induced by an erroneous view of the controlling legal standard...." Miller v. Mercy Hospital, Inc., 720 F.2d 356, 361 (4th Cir.1983), citing United States v. Singer Manufacturing Co., 374 U.S. 174, 194 n. 9, 83 S.Ct. 1773, 1784 n. 9, 10 L.Ed.2d 823 (1963); MacMullen v. North Carolina Electric & Gas Co., 312 F.2d 662, 670 (4th Cir.1963). Such mistakes of fact may be corrected as a matter of law. Singer, supra, 374 U.S. at 194, n. 9, 83 S.Ct. at 1784 n. 9. Accordingly, on remand, the district court will grant relief to those employees hired prior to August 1, 1965 and will determine when, if at all, the Extension Service's continuing wage discrimination stopped. It will award those employees hired prior to August 1, 1965, the date on which the black and white branches were merged, appropriate relief subject, of course, to the applicable statute of limitation.[9] For it is only this group of employees affected by the continuing effects of the Extension Service's pre-Act dual pay system.
 
 II
 
 12
 Salary claims of "those hired after the merger of the black
 
 
 13
 and white branches"
 
 
 14
 The Supreme Court also pointed out our errors in evaluating plaintiffs' statistical evidence. Principally, the Court held that we were in error, as had been the district court, in not considering the statistical evidence based on multiple regressions as evidence of discriminatory payment of salaries. In particular, the Court held, at 106 S.Ct. 3009 n. 10, that the regressions here were not so incomplete as to be inadmissible as irrelevant. Both the district court and the panel majority had considered the statistical evidence of multiple regressions in substantially that light because the expert witnesses had not considered a number of variable factors considered relevant. The Supreme Court, however, held that since the regressions were not so incomplete as to be inadmissible, the "failure to include variables will affect the analysis' probativeness and not its admissibility." 106 S.Ct. at 3009. The Court also held that we were in error in not considering evidence presented by the plaintiffs and the government in addition to their multiple regression analyses. 106 S.Ct. at 3009-10.
 
 
 15
 The first question we must decide with relation to these claims is whether, in the light of the direction of the Court to weigh the evidence within the clearly erroneous standard, we should simply weigh all of the evidence and arrive at our conclusion, or whether we should remand any part of the case. In part I hereof, we have so weighed the evidence, directed relief as to the pre-merger employees, and required remand only as to the extent of the relief afforded. As to those salary claims presently considered, of those hired after the merger of the black and white branches, we think a remand is more appropriate because a far more reasoned weighing of evidence may be accomplished after a sorting out of the evidence pursuant to n. 8 of the Court's opinion quoted above.
 
 
 16
 As the government aptly points out in its brief, p. 24, "[d]uring the trial no evidence was presented which directly related to the question of whether the race-based salary disparities were solely attributable to the facially discriminatorily pay system in place before the 1965 merger or were also attributable to disparities created after either the merger or 1972." In accordance with note 8 of the Court's opinion, "... for employees covered by this suit who were never employed under the dual system, it is meaningless to say that the pre-1965 disparity continued past 1972, absent (1) evidence that new disparities were created or begun after the merger that continued past 1972, or (2) evidence that new disparities were created after 1972." (Italics in original)
 
 
 17
 With these thoughts in mind, on remand, if the parties continue to depend on statistical analyses, they should present such evidence which factors out agents hired before August 1, 1965 and also factor out agents hired before Title VII included the Extension Service in 1972. Along the same line, other evidence presented on remand should also conform to n. 8 of the Court's opinion.
 
 
 18
 After taking such evidence, and in consideration of that and the present record, the district court should ascertain whether or not there was any unlawful racially based salary disparity within the system, and, if so, afford appropriate relief.
 
 
 19
 We note that in considering this subject, the Court in its opinion, at 106 S.Ct. at 3010, quoted Hazelwood School District v. United States, 433 U.S. 299, 309-10 n. 15, 97 S.Ct. 2736, 2742-43 n. 15, 53 L.Ed.2d 768 (1977), and stated that "[p]roof that an employer engaged in racial discrimination prior to the effective date of Title VII might in some circumstances support the inference that such discrimination continued, particularly where relevant aspects of the decision-making process had undergone little change." In arriving at its conclusion, the district court should take this statement of the Court into account, and also give heed to the other evidence mentioned by the Court in its opinion at 106 S.Ct. 3010.
 
 III
 
 20
 In our opinion, we engaged in an extensive analysis of the evidence as it respected the Extension Service concerning the contentions of those who claimed they had been discriminated against in promotions to county chairmen. We based our opinion on the actions of the Extension Service alone, rather than the action of the Extension Service in conjunction with the action of a county in promoting an employee to a county chairman. We examined the act of recommending or not recommending on the part of the Extension Service. 751 F.2d at 675. Because the agreement of the Extension Service and the county commissioners was required in order to fill the vacancy for county chairman, the Court held that we erred because we considered "... solely the recommendations made by the Extension Service rather than the final hiring decisions in which the Extension Service and county acted together." 106 S.Ct. 3003, note 3. The only other identification of error in our opinion with respect to the hiring of county chairmen is at 106 S.Ct. 3011. There, the Court held, in discussing the class action aspect of the case, with respect to a plaintiffs' class action, that we had applied the same reasoning to the charge of discrimination in hiring county chairmen that we had applied in affirming the denial of the class action, that is to say, we did not feel that the claims would be typical against various counties. The Court held that the claims were typical and required us to direct that a class of plaintiffs be certified if the other requirements of Rule 23 were met, 106 S.Ct. at 3012, which we do later in this opinion. And, we should add, in that part of the opinion discussing our affirmance of the denial of certification of a class of defendants, the Court stated that "whether an individual county acted intentionally with the Extension Service in setting salaries or in selecting county chairmen in a discriminatory manner is an issue that once decided with respect to a particular county could not 'be dispositive of the interests of the other members of the class.' " 106 S.Ct. at 3012.
 
 
 21
 Thus, our analysis of the evidence, at 751 F.2d 674-87, stands and remains the law in this appeal. But, that is not the end of the matter. As the Court has pointed out, we erred in applying the non-discriminatory decisions of the Extension Service with respect to the hiring of county chairman to the joint decisions of the Extension Service and the counties in actually completing the hiring.
 
 
 22
 On remand, it will be necessary for the district court, if called upon by the parties, as it doubtless will be, to examine each of the hiring decisions made in the State during the relevant periods of time.
 
 
 23
 After considering that evidence and the present record, the district court will decide what relief, if any, is appropriate, and award it.
 
 IV
 
 24
 The Court also reversed our decision in affirming the district court as it declined to certify a class of plaintiffs. It agreed with the dissenting opinion of Judge Phillips, 751 F.2d at 688, that the claims of the named plaintiffs were typical of other black employees who may have been paid less or denied promotions to chairmen. 106 S.Ct. at 3011.
 
 
 25
 As the Court surmised in its opinion, and as Judge Phillips points out in his dissenting opinion, the other prerequisites of Rule 23, numerosity, commonality of issues, and adequacy of representation, were well established.
 
 
 26
 Accordingly, the decision of the district court not to certify a class of plaintiffs is reversed.
 
 
 27
 On remand, the district court will certify a class of "all black employees of the Extension Service on or after November 18, 1971." 106 S.Ct. at 3011.
 
 
 28
 We do not leave this subject, however, without the following discussion. No contention has been made in this case, at least since it initially came to us, of any black employees discriminated against other than those in the county chairman line of progression, that is to say, county chairman, county agent, assistant county agent, and associate county agent. We have looked through the voluminous record and find no agreement or court order so limiting the area of disagreement in the case, but numerous references in the briefs, exhibits, and court papers lead us to believe there was at least tacit agreement that the proof in the case would be so limited to professional employees and, among those, county chairman, county agent, associate county agent, and assistant county agent. On remand, unless it otherwise is made to appear to the district court that such is not the case, it will be a sufficient compliance with the opinion of the Supreme Court if it certifies a class of all black county chairmen, county agents, associate county agents, and assistant county agents, since November 18, 1971. Any further complaining about the makeup of the class should thus be blamed on us and not on the district court, and we hasten to add that we do not seek to do other than comply with the mandate of the Supreme Court with alacrity rather than with reluctance.
 
 V
 
 29
 We invite the attention of the district court to note 1 of the Court's opinion, at 106 S.Ct. at 3002, where it is stated that "If, on remand, it is finally determined that pre-1965 salary disparities did continue past the date of the merger to a time for which recovery is not barred by the applicable statute of limitations, the courts below will have to decide private petitioners' constitutional claims."
 
 
 30
 Since the date, if any, the pre-1965 discriminatory salary disparities ended has not been ascertained, on remand the district court will decide the constitutional question if appropriate.
 
 VI
 
 31
 The claims of the individuals considered by the district court were not really pursued on appeal other than in the context of a pattern and practice or class action suit, and were affirmed by us in our initial opinion. 751 F.2d at 670. They were not addressed by the Supreme Court in its opinion. In many circumstances, they should not be further considered. See Goodman v. Schlesinger, 584 F.2d 1325 (4th Cir.1978). In Goodman, however, the district court had considered all of the evidence of the plaintiff as if the action had been tried as a class action, and we took no exception to its findings as such. In the case before us, the district court considered the evidence in the case as a pattern and practice case, essentially the same consideration it would have given had the case proceeded as a class action. But the district court erroneously considered the evidence, and it is possible that the district court will come to a different conclusion upon reconsideration after remand from the Supreme Court and this court.
 
 
 32
 In the case before us, as we acknowledged in our earlier opinion, 751 F.2d at 575, if the district court, on remand, should find there has been class discrimination or a pattern and practice of discrimination, the claims of some or all of the named plaintiffs, as well as others in the class, should be adjudicated under a different proof scheme than the one used in the first trial. The claims of class members, including the individual plaintiffs, should be adjudicated under a different evidentiary rule, that is to say, it will be considered that they have made out a prima facie case of discrimination should it be determined there has been class discrimination or a pattern and practice thereof. Teamsters v. United States, 431 U.S. 324, 359, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1971). Thus, the burden would shift to the employer to prove plaintiffs were not victims of discrimination. Teamsters, id. at 359, 97 S.Ct. at 1866.
 
 
 33
 The judgment against the individual plaintiffs, therefore, must be vacated and these claims remanded also for reconsideration by the district court. We express no opinion on the validity of these claims upon reconsideration, and are mindful of the fact that these claims were denied for various reasons, both procedural and substantive. If the district court should find class or pattern and practice discrimination, it should reconsider such of those claims, as are not otherwise barred, under the different proof scheme, that they have established a prima facie case. If not, absent anything else, it may simply affirm its original decision.
 
 
 34
 To sum it up, on remand, the district court will (1) ascertain the proper amount of relief to those employees hired prior to August 1, 1965; (2) certify a class of plaintiffs as previously set forth in this opinion and in the opinion of the Supreme Court; (3) take whatever evidence is appropriate, and, in consideration of that evidence and the present record, arrive at its decision.
 
 
 35
 Accordingly, the judgment of the district court isAFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 36
 JAMES DICKSON PHILLIPS, Circuit Judge, concurring and dissenting:
 
 
 37
 I concur in the majority opinion except in its treatment of the discriminatory salaries claim.
 
 
 38
 There is no legal compulsion to treat the class members hired after 1965 differently from those hired before 1965 and every practical reason not to do so. I would hold that both sets are entitled to the remand for award of appropriate individual relief that the majority now orders only for those hired before 1965.
 
 
 39
 To require that those hired after 1965 now be put to the further expense and delay of making new proof of a pattern originating in the post-Act era and affecting only them is in my view both legally unjustified and most unfair.[1] Taking into account the legal misapprehensions found by the Supreme Court to have tainted the district court's finding that no pattern or practice had been established, that finding is as clearly erroneous with respect to the post-1965 hires as to the pre-1965 hires. Rightly viewed in light of the Supreme Court's legal analysis, see 106 S.Ct. 3000, 3006-11, the evidence presently of record establishes beyond question that from at least 1968[2] until 1976 at a minimum, and possibly until as late as 1981, the Extension Service had engaged in a pattern or practice (or conceivably two technically different patterns) of race-based discrimination in the payment of salaries, surely affecting all pre-1965 hires and almost as surely affecting some post-1965 hires.
 
 
 40
 While it is obvious that more class members hired in the pre-1965 (pre-merger) era will be able easily to demonstrate specific disparities affecting them as individuals in the post-Act era, it is practically certain that so will some post-1965 hires. The evidence unmistakably showed that although post-1965 black hires started out in salary parity with their white counterparts, new disparities soon developed which showed up in the regression analyses of the work force well into the post-Act period. See 751 F.2d at 690 (dissenting opinion).
 
 
 41
 The proper way now to bring this protracted litigation over salary discrimination to a relatively speedy and eminently fair basis in light of the Supreme Court's opinion is as follows. We should hold that the class claimants have established the existence of a Teamsters[3] "pattern or practice" of race-based salary discrimination from as far back as 1968 to as late as 1981.[4] On that basis, we should remand for Stage II proceedings with respect to all members of the class employed at any time during that period who desire to present individual claims.
 
 
 42
 In those Stage II proceedings, any employee presenting a claim would be entitled to benefit of the "Teamsters presumption," see Teamsters, 431 U.S. at 359 n. 45, 97 S.Ct. at 1867 n. 45, that any disparity shown was traceable to the discriminatory pattern. But of course, only claimants able to show such a disparity could prevail. By this means the defendants would have ample protection against the individual claims of post-1965 hires. If, as defendants generally assert, no post-Act pattern of discrimination in respect of post-1965 hires ever developed, that will emerge in the efforts of such claimants to make the threshold showing of individual disparity.
 
 
 43
 In all fairness to these long-delayed claimants, defendants are entitled to no more, and they to no less. I therefore dissent from the majority's treatment of the salary claims of the claimants hired after 1965.
 
 
 
 [1]
 Plaintiffs' initial complaint alleged violations of the First, Fifth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. Secs. 1981, 1983, and 2000d, et seq., and 7 U.S.C. Sec. 341, et seq
 
 
 [2]
 Named as defendants in this suit were William C. Friday, President of the University of North Carolina, various other officials associated with the University and its School of Agriculture and county commissioners from certain North Carolina counties
 
 
 [3]
 See 42 U.S.C. Secs. 2000h-2, 2000d, and 2000d-1
 
 
 [4]
 As will be discussed infra, the Supreme Court rejected this analysis. 106 S.Ct. at 3006
 
 
 [5]
 This holding also was overturned by the Supreme Court. 106 S.Ct. at 3009
 
 
 [6]
 This point too was reversed by the Court. 106 S.Ct. at 54 n. 3
 
 
 [7]
 See notes 4-6 supra. The Court affirmed our determination that no discrimination occurred in the operation of 4-H and Homemaker Clubs. 106 S.Ct. at 3012-13
 
 
 [8]
 Bazemore v. Friday, 751 F.2d 662 (4th Cir.1984), rev'd, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986)
 
 
 [9]
 We note, as did the Supreme Court, 106 S.Ct. at 3008, that there was no statistically significant disparity in salaries in 1981, so, absent other evidence, it would seem safe to assume that such did not exist after 1980
 We further note that discriminatory wages may have stopped for some of these pre-merger employees sooner than it did for others.
 
 
 [1]
 The majority thinks that different treatment of the two sub-sets is mandated by the Supreme Court's discussion in footnote 8 of its opinion. The majority apparently reads this to require new proof by the post-1965 sub-set of a pattern or practice affecting only its members. With respect, I think this completely misreads the Court's peripheral allusion to this subset. As I read it, the Court is simply saying that its textual discussion of the nature of a "continuing violation" obviously could not have reference to members of a class who only became employees after the Act made challenged conduct a "violation." As to them there was no pre-Act conduct which by its "continuation" into the post-Act era became only then a "violation." But the Court certainly is not saying that a "pattern or practice" might not be shown equally to have affected both pre-Act hires on a "continuing" basis and post-Act hires on an "original basis." Here, that is exactly what the evidence did show
 
 
 [2]
 The earliest date to which constitutional claims could run. See 751 F.2d at 690, 694 (dissenting opinion)
 
 
 [3]
 See Teamsters v. United States, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977)
 
 
 [4]
 Concededly, the terminal date of the proven pattern or practice is not that clear on the evidence of record. Because the district court thought no pattern of any duration had been established, it did not address the question. The evidence, rightly assessed now in light of the Supreme Court's opinion, clearly establishes the existence of statistically significant salary disparities, hence a "pattern or practice," down to at least 1976. See 106 S.Ct. at 3008; 751 F.2d at 691 (dissenting opinion). It simply is not clear how far past 1976 such statistically significant disparities, hence a proven pattern or practice, continued, though the opposing experts agreed that by 1981 the disparities, though still present, had become statistically insignificant. See 106 S.Ct. at 3008; 751 F.2d at 691-92 (dissenting opinion)
 On this state of the record it would of course be possible on remand to require the district court to find the terminal date of the pattern or practice on the present or a reopened record. The more just disposition, however, is to assume its existence down to the latest date, 1981, when any general disparities were shown to exist. The effect of this would only be to extend the period during which individual claims could be shown to have arisen. They would still have to be established individually, and if the pattern did not actually exist at the time of their claims, they will presumably not be able to make the required threshold showing of individual disparity.